IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| I.B.E.W. LOCAL UNION 380 PENSION FUND | : | CIVIL ACTION |
| | : | NO. 03-4932 |
| v. | : | |
| | : | |
| BUCK CONSULTANTS and | : | |
| DAVID S. BOOMERSHINE | : | |

O'NEILL, J.                                                                                     JANUARY 30, 2008

## MEMORANDUM

On August 29, 2003 plaintiff International Brotherhood of Electrical Workers Local Union 380 Pension Fund filed a complaint against defendants Buck Consultants and David S. Boomershine alleging actuarial negligence, negligent misrepresentation and breach of contract. Before me now are defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), plaintiff's response and defendants' reply.

## BACKGROUND

The Fund is a multi-employer pension plan that was established on January 10, 1964 as a result of collective bargaining between the Norristown Branch, Penn-Del-Jersey Chapter, N.E.C.A. (the "Association") and Local Union No. 380. Plaintiff has been funded in accordance with subsequent collective bargaining agreements and provides retirement benefits for eligible members of the Union.

The Fund was administered by three Individual Employer Trustees who were designated by the Association and three Individual Employee Trustees who are designated by the President of the Union. During the time period at issue, the Individual Employer Trustees were Thomas Burke, Joanne Hughes and Karen Rabuck, and the Individual Employee Trustees were Leroy

1

Gibson, Joseph McCafferty and Michael Ullman. The Trustees had the general responsibilities of working with members of the Union to provide benefits, negotiating benefit-related contracts, providing health coverage and overseeing the viability of the Fund. In carrying out their responsibilities the Trustees routinely sought information from outside advisors but retained all decision-making authority over the Fund's affairs, including benefit changes. The Trustees conducted their business at monthly meetings between September and June. A consensus of at least two Employer Trustees and two Employee Trustees was needed for the approval of any measure.

Defendant Boomershine provided actuarial services to plaintiff in 1979. In or around 1990 Boomershine began serving as plaintiff's principal actuary and served in that capacity under plaintiff's Trustees terminated him in January 2002. From 1998 through 2002 Boomershine provided his services to plaintiff while employed by defendant Buck Consultants. Over that time period defendant Buck performed annual reviews and actuarial valuations in order to measure the Fund's pension obligations. Buck presented the results of these valuations via written annual reports and oral reports to the Trustees most often at the September meeting, when the process of considering changes to the Fund's member benefit levels typically occurred. Along with the valuations Buck provided the Trustees with an actuarial study of potential benefit changes with corresponding financial data estimating the cost and future impact of those changes. Buck additionally was responsible for completing and signing Schedule B to the Fund's Form 5500 Annual Return/Report of Employee Benefit Plan. In Schedule B the Enrolled Actuary of a pension plan provides information relating to the plan such as its assets, current liabilities, operational information, employer and employee contributions, actuarial cost methods and

assumptions, amortizations and funding standard account.

According to plaintiff, a clear pattern developed in its relationship with defendants: Boomershine would present to the Trustees his annual actuarial valuation at the September meeting and provide one or more proposed benefit increases along with their projected costs. Considering Boomershine's valuation, cost projections and advice, the Trustees would decide which proposals to implement and they would be make effective the following January 1. Defendants note that the options they presented to the Trustees were sometimes competing alternatives. The Trustees did not always accept and adopt Boomershine's or Buck's proposed changes and would alter or reject proposed changes. Defendants cite the September meetings of 1997, 1998 and 2000 as three specific instances of where the Trustees altered or rejected potential benefit changes proposed by Buck's studies.

At the September 1999 meeting Buck presented its annual actuarial valuation along with a series of financial exhibits. The actuarial valuation showed: the Fund's number of active participants increased by 8%; the Fund had a ratio of more than four active participants to each retiree; the Fund's assets, at a market value of $52,623,429, enjoyed investment returns of 11.06% in the 1998 Plan Year; the Fund had an unfunded actuarial accrued liability of $13,180,953; the funding standard account showed a deficiency of $0; and the funding standard account credit balance was $7,230,900. Based on these findings Buck proposed five benefit change options for the Trustees' consideration: (1) raising the multiplier[1] from $110 to $115; (2) increasing each retiree's benefits by 2%; (3) increasing early retirement benefits for members

---

[1] The Normal Retirement Benefits offered by plaintiff are determined by multiplying a member's years of benefit service by the applicable monthly dollar multiplier.

with more than thirty years of service; (4) an alternative method for increasing early retirement benefits; and (5) adding a "pop-up" death benefit.  After weighing the financial data provided by Buck the Trustees present at the September 1999 meeting voted to implement each of the proposed benefit changes except for the alternative method for increasing early retirement benefits.  Trustee Burke was absent and did not participate in this decision.

The minutes of the Trustee meeting of October 1999 reflect that the Trustees signed an amendment to the Fund incorporating the benefit changes adopted the previous month.  The record of the November 1999 meeting indicates the approval of two items Trustee Burke sought to add to the minutes of the last meeting, one of which reads: "Tom's question to David Boomershine.  Will this 1-1-2000 pension benefit increase create an Unfounded Liability? David's response was no."  Also included in the record of the November 1999 meeting is Boomershine's "response from a request from [the Fund's attorney] Jeff Scarpello for David to put in writing his verbal report on the pension funds [sic] new 1-1-2000 increases and the potential for an Unfounded Liability."  The letter written by Boomershine states as follows:

> This letter is in confirmation of my verbal report during the October meeting, as requested.  There are no Unfounded Vested Benefits (UVB) as of 1/1/99.  There was a small UVB as of 1/1/95.  Based on the actuarial studies completed for the September meeting, the approved benefit improvements effective 1/1/2000, projected estimated contributions and asset values at year end, it is my best estimate that there is no expected UVB as of 1/1/2000.  The annual actuarial valuation as of 1/1/2000 will determine the actual liability/asset comparison and UVB.
>
> This prompted a lengthy discussion about the possibility of a market decline in 2000 with the value of the Fund decreasing thus creating an Unfounded Liability as it did in 1995.  At this time the Management Trustee left the room to caucus. When they returned it was agreed that next year we would evaluate the practice of giving increase benefits on future expectations but rather give retroactive increases after the assets are secure.

At his deposition Boomershine testified that these exchanges concerned whether there would be unfunded vested benefits as a result of the adopted changes to the Plan: "what I do recall is that there would have been an unfunded liability, the result which was already in the valuation; but what I recall is there was a question about would there be unfunded vested benefits, which was the purpose of the November 16th letter. . . . So the answer is it's not just a no to unfunded liability. It was a no to the unfunded vested benefits."

In a letter dated January 17, 2000 Scarpello asked Boomershine a series of questions concerning potential withdrawal liability and the unfunded vested benefit liability in 1995. Boomershine responded in a letter dated January 19, 2000, answering Scarpello's questions. In response to Scarpello's question regarding defendants' estimate as to whether there would be any UVB as a result of the increases to the Fund effective 1/1/00 after considering 1999's investment performance and other factors, Boomershine explained that "[b]ased on an updated market value of assets for the Plan as of 12/31/99 of about $53,000,000 we still believe that there is a small chance that there will be a relatively small UVB as of 1/1/2000." Boomershine expressed defendants' understanding that the procedure agreed upon at the last Trustees' meeting included: 1) a complete annual valuation as of the valuation date, defined as the first day of the plan year (1/1/2000); 2) a complete annual study for plan improvements as of the valuation date, as had been the practice in past years; and 3) the retroactive implementation of plan improvements as of the valuation date and not as of the next valuation date (1/1/2001), as had been the practice in past years. Boomershine concluded, "This procedure will be more difficult administratively, but will provide a clearer liability comparison vs. a projected estimate for the following year."

At the September 2000 Trustees' meeting Buck presented its annual actuarial valuation as

of January 1, 2000.  According to the valuation, investment returns for the period of January 1, 1999 though December 31, 1999 were 3.16%, well below the target of 8%.  The record of the meeting indicates, "David reviewed the actuarial valuation for the Pension Plan and explained that because of the turbulent financial markets in the last year there is only room for a small benefit increase this year."  Buck also presented seven potential benefit changes along with cost information for each: (1) raising the multiplier from $115 to $116; (2) increasing each retiree's benefit by 2%; (3) adding temporary supplemental $100/month benefit for retirees until age sixty-five; (4) increasing early retirement benefits for members with more that thirty years of service (two options); (5) adding a revised "pop-up" death benefit; and (6) improving joint and survivor actuarial factors.  The Trustees enacted only the first of these proposed benefit changes.

      At the October 2000 Trustees' meeting Trustee Burke, citing his experience sitting on two other similar trust funds with much lower multipliers, questioned the need for an independent audit to verify Buck's actuarial valuation for the Fund.  In November 2000 the Trustees approved Burke's motion to have an independent actuary conduct a study of the Fund and subsequently retained Beyer-Barber for that purpose.

      At the September 2001 Trustees' meeting, Beyer-Barber presented a report raising several concerns about the assumptions used by defendants in their actuarial evaluations and positing that the Fund's viability could be at risk.  Beyer-Barber projected that by 2004 the credit balance could decrease to zero and the Fund could fail to meet ERISA minimum funding requirements.  Accordingly Beyer-Barber "strongly recommend[ed] that this conclusion be verified with [defendants] and that steps to remedy the situation be taken as quickly as possible."  More specifically Beyer-Barber recommended that "the actuarial assumptions of Mortality, Rates of

Retirement and Disability be reviewed and changed if appropriate." At the September 2001 meeting, plaintiff's counsel Scarpello acknowledged the "significant concerns" raised by the Beyer-Barber report, stated that "[c]urrently the level of contribution to the Plan is simply not enough to support the benefits promised under the Plan," and noted that the actuarial assumptions and the amortization period possibly were too aggressive.

      At the October 17, 2001 Trustees' meeting defendants responded to the Beyer-Barber report and entertained the Trustees' questions. Boomershine recognized that "[s]omething needs to be done" but noted, "I don't think it's a drastic situation." He advocated for "a gradual approach" and more drastic action would be necessary only "if the investment returns of 3% and 4% continue for several years . . . ." At the November 15, 2001 Trustees' meeting, the Trustees asked defendants "to review past Pension improvements, determine their annual cost and report findings at the December meeting for the purpose of trying to offset a 1% increase [in the contribution rate]." Defendants presented its annual actuarial study to the Trustees at the December 18, 2001 Trustees' meeting. At that meeting defendants noted that "[l]ong term with an asset recovery we will be OK, but short term we have a problem." The actuarial study presented to the Trustees thirteen potential changes to the Plan designed to reduce liabilities. The Trustees did not enact any of these changes. At a special Trustees' meeting held on January 3, 2002, defendants were terminated as plaintiff's actuary.

      The Trustees replaced defendants with the actuarial firm Watson Wyatt, which produced and presented its first actuarial valuation of the Fund at the September 2002 Trustee's meeting. Watson Wyatt used the same set of actuarial assumptions as defendants had used in 2000 and

2001.[2]  Watson Wyatt actuary Stan Goldfarb signed Schedule B to the Fund's Form 5500 Annual Return/Report of Employee Benefit Plan in 2002 and thereby attested that "in my opinion each assumption, used in combination, represents my best estimate of anticipated experience under the plan. . . . [T]he assumptions used, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations)."

In September and October 2002, Watson Wyatt informed the Trustees that a significant shortfall in contributions would occur if no action was taken and if the market did not "snap back."  Watson Wyatt actuary Douglas Reymann testified at his deposition that the Trustees knew they could cut benefits at that time.  The Trustees instead decided to increase contribution from 7% to 11% and agreed to fund a $20,000 ten-year projection of funding results under various scenarios to provide a basis for future decisions.

In October 2004, the Trustees decided to reduce the multiplier to zero effective January 1, 2005 (no participant would receive service credit for work in 2005 and all contributions would be added to the Fund with no corresponding liability) and re-set the multiplier at $50 effective January 1, 2006 (participants would resume earning service credit).

Plaintiff's complaint alleges that the unfunded actuarial accrued liability[3] for the plan year ending December 31, 2002 was $43,374,648.00.

---

[2]The assumptions employed by both defendants in 2000 and 2001 and Watson Wyatt in 2002 were: (1) 8% rate for funding purposes; (2) 8.75% rate for FAS 35 purposes; (3) 1984 unisex pension mortality table; (4) 20% retirement rate at ages 60 and 61, 40% at ages 62 and 63, and 100% at age 64; and (5) no disability assumption.

[3]According to plaintiff's complaint, "Actuarial accrued liability is the difference between the present value of all future benefits expected to be paid to the participant and the present value of his future normal costs.  Unfunded AAL is the amount of liability that is not funded."

8

STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See Anderson, 477 U.S. at 255. Rule 56(e) provides that when a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party therefore must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion, and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). However, the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of

9

credibility against'" the moving party.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978), quoting Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 878 (3d Cir. 1972).

DISCUSSION

I.      Counts I and II – Professional Negligence

In Counts I and II of its complaint plaintiff alleges that defendants failed to exercise the requisite duty of professional care in preparing and presenting annual reviews and actuarial evaluations of the Fund for the plan year ending December 31, 1997 through the plan year ending December 31, 2000.  Plaintiff alleges that defendants' representations induced the Fund's Trustees to adopt benefit enhancements which caused the Fund to incur significantly increased unfunded actuarial accrued liability.

In order to establish a claim for professional malpractice under Pennsylvania law plaintiff must demonstrate three basic elements: (1) employment of the professional or other basis for a duty; (2) the failure of the professional to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of damage to the plaintiff.  Kituskie v. Corbman, 714 A.2d 1027, 1029 (Pa. 1998) (setting forth the elements of a legal malpractice claim).  A professional's "conscious exercise of such judgment, 'even if subsequently proven to be erroneous, is not negligence. . . . There is no presumption that [a professional] has been guilty of a want of care, arising merely from a bad result.'"  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), quoting Mazer v. Sec. Ins. Group, 368 F. Supp. 418, 422 (E.D. Pa. 1973).  "The standard of care in Pennsylvania malpractice cases is measured by the skill generally possessed and employed by practitioners of the profession.  Expert testimony is required to establish the relevant standard and whether the defendant complied with that standard . . . ."  Lentino v. Fringe Employee Plans,

Inc., 611 F.2d 474, 480-81 (3d Cir. 1979) ("There have been sweeping statements in Pennsylvania cases that the requirement of expert testimony applies to malpractice actions against members of all professions. . . . The expert witness in professional malpractice is necessary to establish the specific standard of care and to assist the jury in its determination of defendant's conformity to the relevant standard.") (citations omitted).

"[C]onflicting expert reports create a genuine issue of material fact thereby precluding summary judgment on [a] negligence claim." Hill v. Lamanna, 2007 WL 777007, at *12 (W.D. Pa. Mar. 12, 2007), citing Goldman v. Standard Ins. Co., 341 F.3d 1023, 1036 (9th Cir. 2003) ("Who is correct in this battle of experts is not for us to decide. We do conclude, however, that [plaintiff's] expert evidence is sufficient to deny standard summary judgment."). However, "[m]ere gainsaying by an expert, contrary to law and unsupported by fact, will not avoid summary judgment where otherwise appropriate. . . . Likewise, where the facts are undisputed, arguments over the law will not preclude summary judgment." United States v. 294 Various Gambling Devices, 718 F. Supp. 1236, 1241-42 (W.D. Pa. 1989) (citations omitted).

In their motion for summary judgment defendants contend that based on the record plaintiff cannot establish elements two and three of their professional negligence claim. Specifically defendants argue that the undisputed facts show: (1) defendants provided the Trustees with sufficient information to enable the Trustees to exercise discretion and make informed decisions to set the level of benefits provided to members; (2) defendants' professional judgment in setting actuarial assumptions for the Fund were reasonable in the aggregate and thus were not negligent as a matter of law; and (3) any alleged harm suffered by plaintiff was caused by subsequent intervening events over which defendants had no control. Defendants also argue

that plaintiff's contributory negligence bars recovery.

Contrary to defendants' arguments, plaintiff's expert David M. Lipkin concluded that defendants breached their professional responsibilities. Lipkin in large part relied on the Beyer-Barber report, which did not declare that defendants' performance fell below the standard of care but recommended review and reconsideration of the actuarial assumptions used by defendants in the face of a financial situation that presented "some urgency." Supporting and explaining the findings of the Beyer-Barber report, Lipkin found that defendant Boomershine "did not carefully measure the amount of liability that the . . . amendment would create, that his assumptions, aside from the plan amendment, were out of date, and that he did not provide consultation to the trustees, among other things." Lipkin further noted that "[w]hile the Actuary appeared to take great pains to get the calculation 'details' right, he never took the time to steer the plan away from recognizable dangers." According to Lipkin, both Boomershine's one-word response to Trustee Burke's question on unfunded liability on October 18, 1999 and Boomershine's letter of November 16, 1999 were incomplete and inconsistent with the standards of professional conduct. Lipkin stated that "[i]f the Actuary had measured the liabilities before responding, he would have been able to identify and communicate this impending problem."

Lipkin's expert report concluded that Boomershine "failed to respond [to the Trustees' inquiries] that a foreseeable result of the proposed benefit increase would be to severely endanger the financial health of the Plan. This failure to inform breached the Actuary's professional responsibility." Lipkin also found that defendants' assumptions were inappropriate and that Boomershine's "carelessness, combined with his apparent desire for a quick, satisfying response to the Trustees, resulted in . . . an inaccurate 'funding picture' of the Fund to the Trustees,

invariably resulting in their making an uninformed decision." Lipkin then determined that the amendments adopted on January 1, 2000 and January 1, 2001 by the Trustees based on defendants' advice caused damage to the plan totaling $16,439,302. In sum, plaintiff's expert disputes each of the factual conclusions made by defendants in their motion for summary judgment.

Defendants' expert R. Scott Gregory concluded that while defendants "may not have discussed actuarial concepts the way Mr. Lipkin might have liked," defendants in accordance with the appropriate standard of actuarial care: (1) clearly defined and presented reasonable funding objectives to the Trustees;" (2) measured the financial condition of the Plan including the added cost and liabilities of proposed benefit changes; (3) understood the Plan not to be distressingly out of balance when the proposed benefit changes were adopted by the Trustees; (4) informed the Trustees of the Plan's financial condition; (5) never manipulated results to "cover up" the real condition of the Plan; and (6) applied reasonable assumptions to assess the Plan's value. Gregory further noted that "[t]he successor actuary continued [defendants'] assumptions for several years and attested to the reasonableness of these assumptions before deciding to make any changes." Gregory determined that plaintiff's serious financial problems "are due almost entirely to events that occurred after 1999, and which were not known at the time of the 1999 decisions." Gregory concluded that Lipkin's estimation of damages is without merit, as it does not account for unforeseen market events such as the decline in investment markets and the falloff in contributions, and also fails to recognize that the Trustees refused to enact any of defendants' thirteen proposed changes to address the Plan's financial concerns. Indeed, Gregory found Lipkin's report to be replete with meritless assertions and erroneous conclusions.

I find that plaintiff presents evidence sufficient to preclude summary judgment on plaintiff's professional negligence claims. I make no judgment as to whether defendants' behavior was or was not reasonable in the aggregate or whether defendants' behavior indeed caused damage to plaintiff. I note that there is evidence in the record supporting defendants' positions that they acted in accordance with professional standards and that intervening events – such as weak investment returns and subsequent decisions or non-decisions of the Trustees – played a role in the decline of the Fund.

The nature of the exchanges between the Trustees and defendant Boomershine at Trustee meetings and in letters, the reasonableness of defendants' actuarial assumptions and changes to those assumptions between 1999 and 2000 according to the relevant professional standards, and the extent of the effect of subsequent events are very much disputed between the parties and their respective experts.[4] Despite defendants' contention that there is no basis in fact for plaintiff's expert's opinion – and testimony from an expert supporting that contention – I find that Lipkin's expert report and deposition testimony contain more than mere conclusory assertions and present genuine issues of material fact regarding whether defendants acted in conformity with the relevant standard of care and whether defendants caused damage to plaintiff.

Therefore I will deny defendants' motion for summary judgment on Counts I and II of

---

[4]For example, in their reply brief defendants argue, "Given that the Trustees had already been informed that the benefit enhancements would increase UAAL and given its context, Trustee Burke's question, 'Will this 1-1-2000 pension benefit increase create an Unfounded Liability?' can only be reasonably construed to refer to something other that UAAL." At his deposition Boomershine testified that he understood this question to refer to unfunded vested benefits. However, on its face and in context the question is not clear  Because I must resolve all inferences, doubts and issues of credibility against defendants, I will not grant summary judgment based on defendants' inference that the question concerned something other than UAAL.

plaintiff's complaint.

II.     Counts III and IV – Negligent Misrepresentation

In Counts III and IV of its complaint plaintiff alleges that defendants negligently misrepresented that the Fund could afford benefit enhancements in a manner intended to induce the Fund to increase benefit enhancements and that the Trustees reasonably relied upon the misrepresentation to their detriment. Under Pennsylvania law "[n]egligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." Bilt-Rite Contractors, Inc. v. Architectural Studio, 866 A.2d 270, 277 (Pa. 2005).

I find that defendants are entitled to summary judgment on plaintiff's negligent misrepresentation claims. Plaintiff points to no misrepresentation of a material fact in this case; rather plaintiff can only cite statements of professional opinion that plaintiff could afford benefit enhancements. Whether those statements of professional opinion were given negligently is disputed, and accordingly the complaint sufficiently alleges a claim for professional negligence. However, they are not the basis of a claim for negligent misrepresentation. Additionally, there is no evidence that defendants acted with an intent to induce plaintiff's Trustees to adopt any benefit changes or to do anything other than "provide the analysis and the impact on costs as to plan changes."

Therefore I will grant defendants' motion for summary judgment on Counts III and IV of plaintiff's complaint.

III.    Counts V and VI – Breach of Contract

In its response brief plaintiff accepts defendants' assertion that its breach on contract claim fails as a matter of law and withdraws its breach of contact claims.[5]  Therefore I will grant defendants' motion for summary judgment with respect to Counts V and VI of plaintiff's complaint.

An appropriate Order follows.

---

[5]"Failure to perform a service with the requisite level of professional care typically constitutes a claim of negligence, not breach of contract." Official Comm. of Unsecured Creditors of Corell Steel v. Fishbein & Co., 1992 WL 196768, at *5 (E.D. Pa. Aug. 10, 1992) (citing cases). "[I]n order to distinguish a contract malpractice claim from a tort claim, the plaintiff claiming under a contract theory must raise an issue as to whether it specifically instructed the defendant to perform a task that the defendant failed to perform, or as to whether the defendant made a specific promise upon which plaintiff reasonably relied to its detriment." Sherman Indus., Inc. v. Goldhammer, 683 F. Supp. 502, 506 (E.D. Pa. 1988).  "An agreement to act with the legally required level of care cannot constitute a specific contractual promise." Fishbein & Co., 1992 WL 196768, at *6.

Plaintiff recognizes that there is no specific contractual undertaking implicated in Counts V and VI.  The express basis for plaintiff's claims for breach of contract is "Buck's failure to act in accordance with the actuarial standard of care and/or generally accepted actuarial principles and practices" in preparing and presenting an annual review and actuarial evaluation of the Fund for certain specified plan years.  Plaintiff's breach of contract claims essentially restate their negligence claims and thus fail as a matter of law.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| I.B.E.W. LOCAL UNION 380 PENSION FUND | : | CIVIL ACTION |
| | : | NO. 03-4932 |
| v. | : | |
| | : | |
| BUCK CONSULTANTS and | : | |
| DAVID S. BOOMERSHINE | : | |

## ORDER

AND NOW, this 30th day of January 2008, upon consideration of defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), plaintiff's response and defendants' reply, it is ORDERED that defendants' motion is DENIED with respect to Counts I and II of plaintiff's complaint and GRANTED with respect to Counts III, IV, V and VI of plaintiff's complaint. Judgment is entered in favor of defendants and against plaintiff on Counts III, IV, V and VI of plaintiff's complaint.

This case is referred to United States Magistrate Judge L. Felipe Restrepo for further settlement discussions in advance of trial.

___s/Thomas N. O'Neill, Jr.____
THOMAS N. O'NEILL, JR., J.